UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

ARTIFICIAL INTELLIGENCE INDUSTRY ASSOCIATION, INC., Plaintiff,

vs.

OSARO, INC., Defendant.

No. C 25-07170-PHK

ARTIFICIAL INTELLIGENCE INDUSTRY ASSOCIATION, INC., Plaintiff,

vs.

PARALLEL DOMAIN, INC., Defendant.

No. C 25-07658-PHK

San Francisco, California
Tuesday, February 17, 2026

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 1:37 - 2:58 = 1 HOUR 21 MINUTES

APPEARANCES:

For Plaintiff:

225 Ray Avenue, Suite 200
Fayetteville, North Carolina 28301
BY: MICHAEL G. NEWELL, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

For Osaro, Inc:

Thompson Hine, LLP
155 Bovet Road
Suite 600
San Mateo, California 94402
BY: BETHANY D. BENGFORT, ESQ.

For Parallel Domain, Inc.:

Morrison Foerster
425 Market Street
San Francisco, California 94105
BY: TIMOTHY SAULSBURY, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/ Transcriber
echoreporting@yahoo.com

Tuesday, February 17, 2026 1:37 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: Now calling Civil Matters 25-7170 and 25-7658.

Counsel, when speaking, please approach the podiums and state your names for the record and then stay -- stay up here standing when you're speaking. Thank you.

THE COURT: All right. Let's have appearances.

MR. NEWELL: Your Honor, I'm Michael Newell for the Plaintiff, AI.

THE COURT: Good afternoon.

MR. SAULSBURY: Good afternoon, your Honor. On behalf of Parallel Domain, I'm Tim Saulsbury from the Morrison Foerster Firm, and I'm joined by a colleague who represents another Defendant. I'll let her introduce herself.

MS. BENGFORT: Thank you.

Good afternoon, your Honor. Bethany Bengfort on behalf of Osaro, Inc., from the Law Firm of Thompson Hine, LLP.

THE COURT: Good afternoon to you all. Okay.

So, let's talk about -- let's start with the law first. Plaintiff cites Disk Disease Solutions for the propositions that Federal Circuit said identifying the accused products as attaching these sort of patents and just alleging baldly

that each and element of at least one claim, either literally or equivalent, is met is sufficient for pleading purposes.

What's the Defense's response to Disk Disease Solutions?

MS. BENGFORT: Well, I think that's an incorrect statement, and based off of a pleading standard that is no longer applicable. The leading case on the pleading standards for a patent infringement would be BotMates, and there it very expressly states that mere recitation of claim elements and corresponding conclusions without supporting factual allegations cannot satisfy the pleading standards.

THE COURT: Okay. What's your response to BotMate?

MR. SAULSBURY: In BotMate, the Federal Court did unequivocally hold that patent Plaintiffs are not required to plead infringement on an element-by-element basis and then warn to the extent that the District Court and others have adopted a blanket element-by-element pleading standard for patent infringement that approach is unsupported and goes beyond the standard the Supreme Court articulated. So, we too would cite to BotMate but feel that our pleadings meet that standard.

THE COURT: Okay. Plaintiff cites Malco (phonetic) for the proposition that the -- the dismissal

there was reversed because factual disputes about technical operation of the products and claim scope are not appropriate in a Rule 12(b)(6) motions.

So, what's your response there?

MS. BENGFORT: Well, I think that the complaint at issue in Malco is extremely detailed, and it had a lot of supported factual allegations, and the issue there was that all of the arguments for the insufficiency -- sorry -- insufficiency of the pleading were based on classic Markman arguments is what they said, which is we don't think that this qualifies as injection even though there were factual allegations that specifically outlined what the Plaintiff considered to be the injection process.

None of that is at issue here. These arguments are about the baseline sufficiency of the factual allegations, and there -- really no claim construction or others had similar argument here.

THE COURT: Well, let's see. For example, you did this a number of times in the briefing. For the '272 patent, Parallel argues that selecting the background from the library is key language that's essential for infringement and based on the spec distinguishes the claim from the prior art.

Isn't that a claim construction argument that is inappropriate at this stage?

MR. SAULSBURY: Certainly, your Honor. And I'm happy to address this one since it's an argument specific to Parallel Domain. And, as a general matter, I'm happy to address anything the Court has. We're trying to combine argument in -- in the vein of efficiency.

So, no, your Honor. This is about just the plain claim language. There is not a single term in there where there's a dispute as to the meaning of the term. Instead, the claim language itself requires -- it requires three things for this particular step. It requires selecting a background image. You have to select it from a database of background images, and you have to arrange the background image in a background portion of the synthetic sea -- scene, rather.

There are no allegations addressing any of those three components. Instead, the assertion is Parallel Domain creates background environments. This claim isn't directed. This step isn't directed to every single way that you can create a background environment, and there's no way they could have gotten a claim to issue with that broad of a scope.

Instead, it's quite specific. You have to have a database that has your background images. You have to select your background image from that database, and you have to generate your background from that selection process.

None of that is even alleged. So, there's not a claim collection dispute here about, okay, what do any of those terms mean. And if I -- if the Court were to adopt a different meaning, maybe value since they're sufficient, that hasn't been presented here at all. And, in fact, the Plaintiff has proposed no term to be construed, no proposed construction.

The problem they have is their allegations are just that Parallel creates a background button. That can't be enough under any reading of this particular claim step.

THE COURT: The claims chart says that Parallel generates digital twins to create backgrounds, and they argue in the briefing that that's enough to put you on notice that that's their -- I mean, implicit in that is their contention that the claim covers that, right?

MR. SAULSBURY: Sure. That's their -- that may be their contention.

THE COURT: Yeah.

MR. SAULSBURY: But even at this juncture is appropriate and, in fact, necessary for the Court to take a look at the claim language which doesn't say that. The claim isn't about creating a digital twin. The claim is about selecting a background image from a database of background images and then generating your background in that manner.

So, again, no claim construction dispute. That is their contention, to be sure. And what we're saying is that that contention fails as a matter of law because it's not plausible that merely creating a digital twin is sufficient for -- for there -- to infringe this step, which requires a very specific method.

Earlier your Honor was asking about sort of the cases that are at issue here. I think that Judge White's decision in the Zoom v. SIFE case -- I think it's actually SIFE v. Zoom from this District is perhaps the -- is perhaps insightful in terms of reading the various decisions in harmony.

What it essentially says is that in a case where you're dealing with technology of some sophistication rather than a very simple patent, that you need to have allegations addressing at least the critical claim elements, and that makes sense, right, because if you're not doing that, then there's nothing differentiating the alleged infringement from what was well in the prior art and --

THE COURT: Without doing claim construction and looking at the file history, how do I know which claim elements are critical?

MR. SAULSBURY: I think you can -- you can rely on the parties to do that. I mean, if a movant has failed to address claim elements that are critical, then I think

you're right. It's not the Court's job to search the record to figure out which claim elements are critical.

We have highlighted the claim elements that are critical. There isn't a dispute that -- we -- we haven't heard the Plaintiff argue, No, this claim element is not critical or immaterial.

So -- so, we had a step. We've explained why it's critical, and we've explained why their allegations, even if taken at face value and accepting all inferences in their favor, simply can't show that we have this background database that you're selecting from.

THE COURT: Okay. So, let me hear, Plaintiff, what's your view on why you didn't need to propose a specific claim construction here to get over this issue?

MR. NEWELL: Your Honor, I agree that this is -- that was a very simple thing and that without any access to being able to do any discovery to learn more about the facts that are being alleged by defense counsel, it -- it puts the Plaintiff in the position where it's almost impossible to specifically allege exactly how the patent functions to say that it infringes upon us.

But, based on what is publicly available and what we were able to discern from the small amount of discovery we were able to do based on the information we can obtain publicly, the claim elements that are being discussed, we

really -- we've pled adequately what we need to plead to survive this -- this motion. I think what's being argued now would be more sufficient for a summary judgment motion. But at this -- at this level, at this standard, we have already met those standards, and we are talking about claim construction even though we are -- framed it and titling it as something different.

THE COURT: Okay. So, I -- as I said, I understood your contention to be that the generating of digital twins to create background satisfies this limitation kind of in general.

Okay. So, that's your contention, but there's -- your claims charter doesn't make any effort to say how or why that meets the claim term. I understand that's your contention. So, you identified the functionality of the product that you're accusing but the how or why is missing, right.

So, how or why does it meet the claim term?

MR. NEWELL: To the extent that the claims charter is -- of course, we're able to provide all of the -- we were able to obtain all the -- the how or why. We believe that the -- well, why would be somewhat difficult except for describing how we believe that it is used, and in that we can see how it functions for teaching other -- in the ML learning process and so forth and so on.

So, we can see how it is used. But, to answer your question, specifically, some of those details are only going to be obtained pending further discovery.

THE COURT: Okay. Let's go back to the case law. In the briefing, Mr. Newell, you cited the K-Tech Federal Circuit case, and the Defense points out that the -- the reasoning in K-Tech relies on old Form Complaint 18 which has been abrogated. So, why should the Court follow K-Tech?

MR. NEWELL: Well, because what -- when it cites Form 18, the specific standard that we are citing to is not -- if you give me a moment, I'll get to that portion of the complaint. As we said, it's fairly complex, a 2,000 page -- okay. Yeah, the abrogated Form 18 standard.

I believe this misses the point of K-Tech's holding regarding the information and belief pleading was based on a fundamental principal that a defendant cannot shield itself from a complaint for direct infringement when the relevant facts are within its exclusive control.

So, here it goes back to the argument we were making previously. Those things remain under the Defendant's exclusive control. So, to that end, this survive -- it should survive beyond that abrogated understanding of Form 18.

THE COURT: All right. In their reply brief, the Defense cites two Northern District cases that essentially

reject information and belief pleading. That's the Ross v. Abbott case and the Celgard v. Sinjin case, which was cited at page nine in the reply brief.

Since you don't get a surreply, this is your chance to give me your arguments as to why those cases should not be followed here.

MR. NEWELL: Yeah. We have the --

(Pause.)

THE COURT: And these both go to the Plaintiff information and belief pleading.

MR. NEWELL: And I know we briefly addressed the information and belief before, but I want to provide some additional context.

(Pause.)

MR. NEWELL: Essentially, without taking the Court's -- too much of the Court's time, the allegations on information and belief go back to the same arguments we made about being under exclusive control of the Defendant. So -- as cited in our -- our reply.

THE COURT: Okay. So, what's the Defense's view? I mean, the facts, especially given the -- the way software exists, if the details of how the software actually operates is not visible to people out in the world, other than information and belief pleading, how is the Plaintiff supposed to adequately plead? I mean, not prove later but

plead for purposes of the complaint?

MR. SAULSBURY: Absolutely, your Honor. And a couple of responses. One of them is with respect to these elements that we're talking about, this isn't stuff where you need to look at the source code, right. It's available in the user interface. If the way that you create a background image is that you go in and select it from a database, you'd expect to see that in the user interface. We have a trial product that they could use. This -- I mean, when I'm on the Plaintiff side, right, I go look at the product to develop a Rule 11 basis. That was their obligation for both Rule 11 and Rule 8 purposes.

And, so, there's no reason they couldn't have done an investigation sufficient to determine whether we practiced this particularized step of selecting a background image from a database to generate background environment. We don't have that at all.

With respect to information and belief pleading, I think those two NDCAL cases really do get to the point. It's not a -- you can't -- it can't be relied on as an excuse to fail to satisfy your obligations under the pleading standards and, as those cases hold, sort of is an indication that there isn't enough there in the facts.

Now, to be clear, we're not saying that they can't rely on information and belief pleading at all. I don't think

that's dispositive to the motion here. I think those cases stand for that proposition, but here, with respect to these steps that we're talking about, we're -- we're taking at face value everything they said, irrespective of whether it's pleading on information and belief or not.

The point is even if you take at face value this digital twins assertion, that doesn't come close to supporting the inference that we meet the particular step.

THE COURT: Well, we're on '272. So, in their motion, Osaro argues, among other elements, that the claims chart doesn't really identify what the accused graphics engine is, what the accused synthetic 3D scene is or what the scene metadata file is. And I look at your chart, and I'm -- there's no real response in your opposition brief on those claim terms. So, what's -- what's the response?

MR. NEWELL: The response would be similar to what we've already said -- and this is Osaro, right? We switched back to --

THE COURT: Yeah.

MR. NEWELL: Okay. I just wanted to make sure.

MS. BENGFORT: We're flipping back and forth here, your Honor.

MR. NEWELL: I'm flipping --

THE COURT: I'm going patent by patent. So --

MR. NEWELL: I'm trying to mentally flip back and

forth between the two. I think with the SiteWorks, that we -- if we're speaking directly to the claim chart, we recognize that it is bare in -- in some aspects in regards to Osaro and claiming, you know, the things that their technology does.

However, the things that it does do and some of the contentions that it, like, does not construct synthetic images instead of real images, we feel there's processes in between those two steps that we won't know at this -- at this point in the claim.

But, to the extent that you're going directly to that claim chart, we recognize the position that there are some additional information that could be provided in that claim chart that we don't have access to at this point.

THE COURT: Okay. But you -- you don't -- let me pull up the claims chart. What is the accused graphics engine?

(Pause.)

MR. NEWELL: Let me pull it up, your Honor, go directly to the information we have on that.

(Pause.)

MR. NEWELL: The specific accused graphic engine is going to be for -- for purposes of our knowledge at this point -- of course, we just cited as that graphics engine. So, I don't have anything to add to what we have specific on

the claim chart for Osaro today.

THE COURT: Okay. Similarly, later on in the claim it calls for a virtual camera. So, where -- again, other than just saying they have a virtual camera, where -- what is the accused -- what actually is the accused virtual camera?

MR. NEWELL: When you say the virtual camera -- and I -- your Honor, I want to be specific.

THE COURT: Yeah.

MR. NEWELL: The --

THE COURT: The claim term is placing by an image protector a virtual camera within the synthetic image scene.

MR. NEWELL: Is what we were able to discern from essentially the publicly available information of what -- how they use the technology.

THE COURT: Okay.

MR. NEWELL: And that -- that's how it is described in their publicly available information.

THE COURT: Okay. What's your response on that? Is there -- is there public information that says you have the virtual camera?

MS. BENGFORT: Well, I don't believe so because I don't believe SiteWorks uses a virtual camera.

But, to the point about there being public information about how SiteWorks works, absolutely there is. You know,

they quote saying SiteWorks says it uses advanced division systems, right. But the website doesn't just say that. It explains in detail what those advanced vision systems are and how they work. It would be extremely poor marketing if we just said it uses advanced vision systems and leaves it at that.

So, there's plenty of information available about how SiteWorks works. The problem here is that they can't just say, I think this infringes the patent. They need plausible sufficient factual support that would create a plausible inference that SiteWorks, you know, uses the patented technology. And they have absolutely nothing here in the claim charts that suggests in any way that SiteWorks even might perform these steps. And that is -- that is what is necessary for baseline sufficiency.

You know, a patent plaintiff can't just throw things at the wall and see what sticks. That's not how the litigation process works.

THE COURT: Okay. But how -- what's your response specifically to the contention that, Well, on information and belief, they believe you use a virtual camera and the only way we could really know, because it's not public, is by looking at the source code and looking at how the software works and taking some discovery?

MS. BENGFORT: Well, a -- a virtual camera would

be a user interface feature, and you could point out, you know, you have the software interface. They say, I'm going to place a virtual camera here in this scene so that we can look at it from this angle it moved around. And that's how a lot of different software out there works. There is no reason you have to resort to the source code to determine that.

THE COURT: What's your response on that? I mean, the -- Mr. Saulsbury made the argument that, you know, for Parallel there's a trial product you could have used to -- to test out.

MR. NEWELL: For -- for what we're able to use when we saw Parallel Domain's virtual camera configuration tools --

THE COURT: Okay. What about Osaro?

MR. NEWELL: For Osaro I believe it was the synthetic -- on SiteWorks, the synthetic data generation modules was the most definition that we were able to obtain. So, from what we were able to see from the publicly available information is what we were able to include in our pleadings to this point.

THE COURT: Okay. So, why is it insufficient for pleading purposes for him to say on information and belief the synthetic data generation module satisfies the virtual camera limitation?

MS. BENGFORT: Well, because I have absolutely no idea what he's referring to when he says synthetic data generation module. That is not a term Osaro uses for any of -- and even then, it's really just a recitation of what the claim limitation says. It is, you know, generating synthetic -- synthetic images. They're just taking that phrase and then rewriting it and saying Osaro does this. And --

THE COURT: Yeah.

MS. BENGFORT: -- BotMate and all of the other cases make clear you can't just do that.

THE COURT: Is synthetic data generation module a term used in the Osaro materials that you -- that you rely on?

MR. NEWELL: I believe so from the -- from the SiteWorks it's the identified feature -- a specifically identified feature of SiteWorks.

MS. BENGFORT: I don't believe that's that's the case. And, even if it is, the complaint does not point to where that information is coming from or give us any way of discerning what feature they are talking about.

THE COURT: Do you have a citation for that?

(Pause.)

MR. NEWELL: I don't know how quickly I can get to that at this moment.

(Pause.)

MR. NEWELL: I don't at present. I don't want to take too much of --

THE COURT: Okay. All right. So, in your briefing, you take the position that you know -- at least you -- I think you rely on your investigation to say that SiteWorks uses deep learning and "advanced vision systems". I think your contention is that that is sufficient to plead that they used -- they use synthetic image generation.

I guess I go back to the how and why. I mean, I understand that's your contention, but how and why does deep learning or advanced vision systems plausibly mean synthetic image generation?

MR. NEWELL: To answer your Honor's question, the -- the why essentially is from the publicly available information would be in the use of the -- how the product is used by a client. I think that will be further developed actually as well, but the how is also difficult to ascertain without knowing step by step beyond what is in the pleading how -- how it is -- how it functions essentially from step one until the image is created or selected.

For some things, we speak about a database of images, and we also have virtual cameras, but there's steps between virtual cameras and the databases that are created by those specific images. The synthetic data image collection is

what we are alleging is a -- potentially infringing upon our patents. So --

THE COURT: So, hypothetically, if a claim requires a fastener and your contention is that a nail satisfies that contention, right, even though you're not sure they use a nail, you just -- you think based on some public information that they probably use a nail, you'd still be able to answer the question how does a nail satisfy the term "fastener" because you could say, Well, nails are known in the art or nails have this general feature that we know about, and if they use a standard, then this is how or why we think plausibly a nail satisfies the fastener claim limitation, right.

So, understanding that you haven't taken discovery from them, there must be some theory as to -- I mean, the phrase "deep learning" is fairly broad. I mean, you must have some theory as to why deep learning would satisfy synthetic image generation. I mean, some -- do you have an expert who says, you know, one common way of using deep learning in these systems is to create -- generate synthetic -- I mean, I -- I'm just -- I'm trying to figure out there's a -- you understand there's a logical gap there that normally could be filled with at least some theory, right?

MR. NEWELL: I believe that would essentially come from Defendant's public statements, what's available on

different -- we do cite the different YouTube videos that describe the product and how and why the synthetic images are developed. I do -- it's not within the four corners of what we have already provided. So, it's difficult to cite to.

THE COURT: Okay. So, I mean, the reply brief argues that, you know, there are other ways to use deep learning and advanced vision systems that are known in the prior art that don't rely on synthetic image generation.

So, again, it would be one thing if you took the position that anyone using deep learning and advanced vision systems must inherently generate synthetic images, but, as they point out, that can't be right because there are prior art systems that don't -- don't do that.

So, I'm just trying to figure out what your plausible theory is there as to how you're going to fill that gap?

MR. NEWELL: At some point from -- we do have, you know, analyst who examines how the product works from step one to the final step with those synthetic images. We believe that it -- and I recognize your Honor is asking for something more specific in that regard, but to that extent, we rely upon what's on the specific claim chart and what's in our pleadings.

THE COURT: Okay. I'm asking for anything -- I mean, anything beyond just what's in the claims chart

because there really isn't, right. I mean, it just -- it just says it's there without -- without any -- I mean, I think you admit it's fairly bare, especially with Osaro, right?

MR. NEWELL: Especially with -- yeah, it's more bare with Osaro, yes, certainly.

THE COURT: So, then I come back to the general rule for motions to dismiss. So, I'm supposed to take their allegations as true, right. And, so, his contention, his allegation is that deep learning and advanced systems infringe the -- the claim limitation of synthetic image generation.

Why can't I -- why am I -- why am I allowed not to take that as true and resolve that against him on a motion to dismiss?

MS. BENGFORT: Well, you don't have to take it as true if it contradicts, you now, the -- what is incorporated into the complaint, which is the patent itself, and the patent itself describes exactly what the advance of the prior art is in the patent. And what it says is that traditional machine learning used -- relied on real images from the real world in order to train its systems, right. And, so, that is deep learning. That is machine learning. They describe that as a process that is in the prior art, and they say what we have created is a novel way of creating

-- of using synthetic images, which are AI generated images, to also train machine learning in order to -- to make up for the gaps or the limitations on the amount of physical real photographs that are available.

And, so, even from the face of the patent itself, it itself says, Hey, machine learning, deep learning, these sort of vision systems and training systems all already existed. What we are claiming is something specific that goes far beyond that.

And, so, these generic terms do not give a plausible inference that this very very specific patent claim is met.

THE COURT: Okay. Going back to the -- on the -- sticking with the '272, but going back to Parallel, in the briefing Parallel raises the question is Plaintiff actually asserting Claim 17 against Parallel, of the '217 patent or not.

MR. NEWELL: '718?

THE COURT: 17.

MR. NEWELL: No.

THE COURT: Of the '272 patent?

MR. NEWELL: 272, yes.

THE COURT: If you look at Footnote -- Footnote 2 of the opening brief, the complaint mentions Claim 17 but makes no attempt to read it onto the Parallel accused product.

So, the question is are you actually intending to assert Claim 17 of the '272 against Parallel or not? I mean, you're -- I assume that you're asserting Claim 1, correct?

MR. NEWELL: Claim 1, yes. Claim 17, oh, the -- the automating the generation of realistic labeled synthetic image data. Claim -- we are asserting Claim 1.

Claim 17 on '272, let's see.

(Pause.)

MR. NEWELL: Yes, we're asserting Claim -- Claim 17. I'm looking for the amended complaint. Yes.

THE COURT: Okay. Is there a discussion to Claim 17 in --

MR. NEWELL: Yes.

THE COURT: -- in the amended complaint?

MR. NEWELL: I was looking at -- actually, I'm sorry. I was looking at the original complaint, not the amended complaint. You are correct.

MR. SAULSBURY: Or in the opposition.

THE COURT: Right.

MR. NEWELL: Right. No. Actually, it's no to Claim 17.

THE COURT: Okay. So, just for the record, I just -- I just really asked for clarification. I just want to -- the record's clear, Plaintiff is not asserting Claim 17 of

the '272 patent against Parallel?

MR. NEWELL: Correct. Correct, your Honor.

THE COURT: You've got your answer.

MR. SAULSBURY: Okay. Thank you. Thank you. I appreciate that.

THE COURT: All right.

MR. SAULSBURY: Your Honor, if I may just briefly address the --

THE COURT: Yes.

MR. SAULSBURY: -- question you had, the question about why can't the Plaintiff just assert the conclusion, I've alleged that this particular thing is present in the Defendant's product. We'll say it's a nail. And they assert or the contention is that that meets a particular claim element. Why isn't that enough? Why isn't that sufficient at the Rule 12 stage?

And I think the answer is that if that were all, then Rule 12 would have no teeth whatsoever, right, because every plaintiff would just assert this particular thing meets a claim limitation, and then it would be impenetrable from the perspective of the Court or the Defendant.

THE COURT: Well, going back to my hypothetical, if they said a boiled piece of spaghetti qualifies as a fastener, right, or gaseous vapors qualify as fastening two pieces of wood together or something completely ridiculous,

right. I mean, you could -- Defendant could still make the lack of plausibility argument, right, based on that contention?

MR. SAULSBURY: I actually think that at that point it starts becoming more of a factual issue. It's like can a piece of spaghetti ever be a fastener? It's like, Well, if you're in a pinch and it has enough starch, maybe it will be an adhesive, but --

THE COURT: Yeah, well, maybe spaghetti wasn't -- I'd probably switch to gas.

MR. SAULSBURY: But I guess the bottom line is there has to be something more, right? There has to be an explanation, you know, that this -- this particular set of things factually is present -- that can be the allegation -- and some sort of explanation of how those things that are present meet the claim limitation. This is your how and your why.

Again, just taking the '272 claim element as an example, there's no how or why for how just like merely generating backgrounds can satisfy the limitation --

THE COURT: But how do you balance that against the Federal Circuit clearly saying you don't need -- the Plaintiff doesn't need to go element by element, right? So --

MR. SAULSBURY: I -- I really think that the Zoom

v. SIFE case does the best job sort of reconciling these various cases, and what it says essentially is you have to look at least at the critical claim elements, because if you don't look at the -- if the critical claim elements aren't plausibly met, there's not plausibly infringing. That's sort of what the Federal Circuit's said. You don't have to have a checklist that's every single last limitation done on there as long as taken as a whole it's plausible that there's infringement.

Well, if you take a look at the key claim limitations and there's nothing there, then taken as a whole, there's not a plausible inference that there's infringement.

THE COURT: There's a little bit of bootstrapping with that because, by your logic, any claim element that a defendant raises is necessarily critical, right? Because, otherwise, I've got to engage in claim construction to figure out is it really critical as a legal matter, is it the point of novelty in all that, right?

MR. SAULSBURY: I don't think that requires claim construction. There certainly isn't a contention -- again, there's no dispute that this is a critical claim limitation. You might be in a different situation if that were presented, but that's not presented.

So, I think here where it's undisputed that this is key and -- and there's just not allegations addressing it, then

it's -- it's relatively straightforward.

There's two more issues on the '272 patent with respect to Parallel. I didn't know if your Honor is satisfied with the papers. We're happy to rest on the papers but also to address it if the Court has -- if your Honor has questions.

THE COURT: So, I've got some more questions.

So, Mr. Newell, you made reference to this. In your briefing you argue that you cite to a promotional video that talks about -- that says something like choose from our massive library of cities, highways and residential neighborhoods.

In the reply brief, the Defense points out that none of that language from that promotional video is in any of the paragraphs cited in the amended complaint, and I don't -- when I looked at it, I didn't see a citation to which promotional video you were quoting from. So, how is -- how is it sufficient to cite language from promotional video that's not identified in the amended complaint and then cite -- and quote language from that video that's not in the amended complaint?

MR. NEWELL: The complaint -- in that complaint construction, there may be a paragraph that was mistakenly removed to the final draft because it does cite to the specific language about the massive library of environments and 3D object configuration and things of that nature, and

the underlying rendering technology.

So, the functional steps we would say are also on Parallel Domain's marketing materials, and they still are under this claim process. And that -- as they put different labels on this technology, it still doesn't change functionally what it does in creating this massive library of -- of synthetic images and environments.

So, I recognize what your Honor says -- has cited to about the absence of that specific material. Obviously, we have more material that if we were granted leave to amend we could include, which we think would be more appropriate in this matter to grant leave to add to that -- add that information to the claim if it is determined that it is not sufficient.

THE COURT: I don't -- look at paragraph 63 to 65. There's no -- the word "library" doesn't appear there as far as I can tell.

MR. NEWELL: I would have to follow along with your Honor.

THE COURT: Mr. Saulsbury, am I wrong? Is library in --

MR. SAULSBURY: No, no. It is not. And that's the thing. I mean, if they have -- if they have the goods, their amended complaint was the place to put it. We pointed out -- we pointed out the deficiencies before they served

their amended complaint. We pointed out the deficiencies again after the served their amended complaint and before we have to move. And, so, addressing counsel's comment, I don't -- I don't think leave is appropriate at all. I mean, they had multiple opportunities, and this appears nowhere in the set of paragraphs of the complaint.

(Pause.)

THE COURT: All right. So, I -- Mr. Newell, I think you admit there's no identification of where this quoted language is coming from. You don't cite to the video you're quoting from, right?

MR. NEWELL: No, I don't cite to the video that I'm quoting from on here.

THE COURT: All right. And -- I don't know if you had a chance to look, but I think if you looked at paragraph 63 to 65, there's no mention of a library of anything, whether it's parameters or other things.

MR. NEWELL: I'm not there where your Honor is to -- to verify that. I will be shortly.

MR. SAULSBURY: And reviewing that, there's also no recitation of the selection that's required or the selection resulting in the generation of a -- of a background.

(Pause.)

MR. NEWELL: No -- no library between 63 and 65.

Your Honor is correct.

THE COURT: Okay. And then on '272, you argue that Plaintiff's intention was to assert Doctrine of Equivalence with the '272 patent, and you cited paragraphs 74 to 77 of the first amended complaint for that contention. But there's no mention of Doctrine of Equivalence in those paragraphs, as they point out in their reply brief. So, how is there a sufficient pleading of a Doctrine of Equivalence for the '272 patent?

MR. NEWELL: Your Honor is correct that that was -- the paragraph cited there is -- it was another error in construction there.

THE COURT: Okay. Well, when I looked at the pleading for the '272, I really didn't find any explicit pleading of the Doctrine of Equivalence anywhere really. I mean, you kind of do it I think for one of the other patents. At least you use the phrase Doctrine of Equivalence, but you didn't do it for '272. So, I guess this is more of a clarification question.

Was the Plaintiff intending to assert Doctrine of Equivalence under the '272 patent as against Parallel Domain?

MR. NEWELL: I believe as -- as your Honor cites, it was listed in regards to another patent. Let's see, '272 patent, let's see.

(Pause.)

MR. NEWELL: I know it wasn't cited separately in the section that you are referring to, but we do reference it, and we do intend to allege the Doctrine of Equivalence. I want to find the exact spot where we discuss it.

(Pause.)

MR. NEWELL: But, to save the Court's time, we do refer to what is in the pleading.

THE COURT: Okay. Just so I'm clear, putting aside for a second that it's -- based on my review, it's not there in the pleading, you're telling me Plaintiff does intend to assert Doctrine of Equivalence under the '272 patent against --

MR. NEWELL: Not under -- not under '272.

THE COURT: Not?

MR. NEWELL: Right.

THE COURT: Okay. All right. So, clarified. Plaintiff is not asserting Doctrine of Equivalence infringement theories under the '272 patent against Parallel Domain, correct?

MR. NEWELL: Correct.

THE COURT: Okay. You have your answer there.

MR. SAULSBURY: Thank you.

THE COURT: Okay. Okay. Well, this will be -- let's talk about '693. So, I think there's no dispute the

claims chart is for the wrong patent, right? And, as I understand the briefing, Plaintiff is saying they should be given leave to amend to put in the right claims chart for the right patent, right, '693 patent.

Under Rule 15, why -- why should I not allow that?

MR. SAULSBURY: So, a couple of responses, your Honor. Although there's -- there's a liberal pleading standard, it does anticipate some amount of diligence, right. And there's also a futility standard as well.

Leave to amend should not be granted where there's reason to believe that it would be futile. Here there's no reason to believe that it would be anything but futile. If they had a good basis to assert infringement of the '693 patent, presumably, it would have been in their complaint, right, either in the claim chart or in the body of the -- the complaint, but it's in neither places. They assert the wrong patent in both places. I think it's a fair inference to draw from that that they don't actually have sufficient substance on the correct '693 patent, and it would be highly prejudicial to us to have to deal with this yet another time.

They -- they have the obligation in the -- in the sort of ability to plead this in any of their -- any of their two complaints, and they declined to do so.

THE COURT: So, I guess asking for clarification

again. Are you intending to try to assert the '693 patent -- the proper '693 patent against Parallel?

MR. NEWELL: Yes, your Honor, and we would cite to the -- that it should be freely given when justice so requires and -- and no specific prejudice has been cited to, you know, make that amendment to the -- to the amended complaint. So --

THE COURT: How do you respond to the contention by your colleague here that it's a fairly simple matter of diligence to make sure you attach the right claims chart?

MR. NEWELL: Again, I would have to go back to the multiple of drafts of the document, it being left out in there.

MR. SAULSBURY: And, just briefly, your Honor, there was a point made that we don't sort of assert specific prejudice. I mean, we very much do. We explain in our briefing that we'd be unduly prejudiced by the significant expense. And it's very real for our client. Our client's a startup. He can't keep on spending all this money addressing entire list of assertions, and I think an additional factor here is we told them about this before moving. We pointed this out and said, Come on, Guys. Are you going to make us move? And they just didn't respond to our letter at all. I think --

THE COURT: Why didn't Plaintiff cure this when

they -- when it was -- when you were apprised of it by the Defense?

MR. NEWELL: Your Honor, I would have to look back at this specific communication. I know there were multiple things that were addressed in the amended complaint. That specific item we can -- I'd have to look back at it to see why or what the language was incorrect in that specific thing. As I stand now, I can't.

THE COURT: Okay. But presumably, somewhere there was a piece of correspondence -- the Defense is representing that a piece of correspondence or an email or something -- it's not -- I assume it's not a very detailed discussion. Either it's the right claims chart or it's not, right. I mean --

MR. NEWELL: Correct.

THE COURT: -- somebody on your team got a communication saying you attached the wrong claims chart. I mean, why not fix it when you see -- when you see that?

MR. NEWELL: Well, your Honor, taking that into consideration, we do have an -- a big claims chart available to amend this document and for any error in communication between whatever party received that communication. We'll just have to stand on what we produced and request leave to amend that specific thing.

THE COURT: You want to represent for the record

what that communication was?

MR. SAULSBURY: Yes. I mean, it was a -- it was a letter directed to counsel as well as their California counsel. It's actually attached to our motion. And that letter which we sent before -- before we filed our motion pointed out that they attached the -- the wrong claim chart, and we asked them to address it, and we just didn't get a didn't get a response at all.

THE COURT: All right.

MR. SAULSBURY: This is Exhibit B. This is DI31-3. It's a letter -- letter to counsel for Plaintiff, again, including their California counsel as well and was signed by me.

THE COURT: Was it sent to Mr. Newell?

MR. SAULSBURY: I -- I believe he was copied on it, but we -- we sent it to the two -- we sent it to two attorneys that had appeared I think and signed the complaint. We sent it to a Mr. McDonald and Mr. Fry.

THE COURT: Mr. Fry is on the complaint. Mr. McDonald isn't.

MR. SAULSBURY: Fair enough, your Honor.

THE COURT: Okay. Well, you may want to talk to Mr. Fry about this as well.

All right. Sticking with '693, so, for the stereo camera device limitation, Plaintiff says, Well, you -- the

documentation they've seen says you use multiple cameras, and their contention is multiple cameras is -- is stereo cameras.

Why isn't that insufficient for pleading purposes?

MS. BENGFORT: Sure. So, I think the patent actually talks about what a stereoscopic camera is, which is a specific type of camera where they -- it's a camera with two different lenses that it creates the -- the impression of depth by allowing you to take video on two streams and then combining them together into one video, right. And there is nothing about the term "multiple cameras" that at all suggest it is a stereoscopic camera. I mean, cameras long existed in the prior art. There are a lot of different types. You can have different cameras set up different places. And, in fact, the use of multiple cameras suggest that there is not one stereoscopic camera with two lenses the way the patent describes. So, that was insufficient.

And it's also insufficient because the -- the patents aren't just about stereoscopic cameras. They're about stereoscopic video, right, and recording video is a particular process using a stereoscopic camera. And, in fact, patents go into detail about realtime processing embedding of calibration data into these video feeds, right. So, it's very particular about the type of data that is being processed and how it is done.

Here, you know, there is no allegation that video at all is taken, right. No -- or I should say no substantive factual allegation actually pointing to a SiteWorks feature or product or component or component or whatever it is that says video is taken.

So, that is the highest --

THE COURT: Their camera -- but they're cameras. Isn't there video?

MS. BENGFORT: No, not necessarily. You can have cameras that take single images.

THE COURT: Okay. I guess I assumed the SiteWorks material would have identified what kind of images are being used by the camera, what kind of -- I guess what kind of imaging the cameras are doing. They don't?

MS. BENGFORT: The -- SiteWorks certainly does, and we also wrote that in our letter to counsel saying, Hey, we don't take video. We actually take single images, and this is the way it's processed, and here's the publicly available information that shows that. I don't think that's important for a motion to dismiss, but they were very well aware of that.

THE COURT: Okay. Well, so, the claim chart says advanced vision systems that process visual data from multiple cameras satisfies this claim term. And, so, I go back to how and why because, as they point out, just because

you have multiple cameras doesn't necessarily make it a stereoscopic camera and doesn't necessarily -- a camera doesn't necessarily require video.

MR. NEWELL: A camera doesn't -- yes, your Honor, I recognize that it doesn't necessarily require video from our understanding of what we were able to obtain publicly. I understand the contention and the description, we think deeper into that description requiring us to go further.

THE COURT: You mean you did discovery there?

MR. NEWELL: Yes, your Honor.

THE COURT: Okay. Well, then I guess I go back to my similar question. On a motion to dismiss, this is their contention, that, you know, an advanced vision system that processes visual data from multiple cameras satisfies the claim limitation. If I'm supposed to take that as true, if I take that as true on a motion to dismiss, doesn't that -- I'm not saying they're right, right, but just for purposes of 12(b)(6), why isn't that enough to get past your motion?

MS. BENGFORT: Well, I don't think you need to take generic and conclusory allegations as true, especially, again, when they contradict in the face of the patent, right.

So, Plaintiff is not claiming to have invented stereoscopic video, right, or -- or cameras or anything like that. What they're claiming to have invented is a specific

process of embedding calibration data into two live feeds coming from a stereoscopic camera, and it requires a bunch of steps. And just saying that there are multiple cameras is not a plausible basis to say that SiteWorks performs all those steps. And, again, there is a lot of publicly available information I can point to to say, Oh, no, it's these features that give a -- a plausible case for infringement, that they -- I guess they couldn't have because it doesn't, but, you know, these baseline highly generic allegations just can't even come close to meeting a pleading standard here.

THE COURT: Okay. On the -- the related rate, the '315, Osaro makes the similar argument that the claim chart doesn't really say what the accused stereoscopic 3D video sequence is, what the accused left right channels are and what actually generates the video stabilization operation, and they really see a reply to that in your opposition. So, what are those things? What are the accused limitations there?

MR. NEWELL: As I stand here, your Honor, I'm unable to answer the specifics of how that functions and how it violates our patent. We have to still stand on how it is alleged within our Plaintiff and supporting documents.

THE COURT: And staying on '315 but talking about Parallel now, Claim 1 requires embedding calibration

information in at least two ways, and the second way is embedding the inertial measurement data, and they point out that the claims chart doesn't expressly identify inertial measurement data. So, where is the accused inertial measurement data?

MR. NEWELL: It's not in our claims chart, your Honor.

THE COURT: Yeah.

MR. NEWELL: You're correct in seeing the absence of that in our claim chart.

THE COURT: Okay. So, is there -- by their argument, that's a critical claim chart -- claim limitation. And, so, you -- are you agreeing that you haven't plausibly shown infringement for '315 as against Parallel?

MR. NEWELL: Well, what we would say is we would still lean on what we already said for other issues would be we don't have that information and that it would be only information that the Defendants would have access to. Based on what we were publicly able to see is what we were able to provide in our claims chart.

THE COURT: Okay. But the -- I mean, that -- those arguments have been made where you actually said at least something, right? But this one you didn't say anything. I mean, there's no contention here.

MR. NEWELL: Yes, your Honor. I recognize the --

the issue with that particular portion of our claims chart.

THE COURT: Okay. On a motion to dismiss, how am I supposed to take into account your representation of fact that your camera rigs don't have accelerometers? It's not --

MR. SAULSBURY: I actually don't think you don't have to take that into account. That was just context. The -- in some respects, I think Parallel's motion is actually easier with respect to this patent and the first patent in the sense that there's not an allegation at all, and I guess that's true for some of their patents too. But there's not an allegation at all that the inertial claim limitation is met. And, so, there's a -- it just zeroed out. I mean, it's relatively straightforward for the Court. This is similar to how for the '272, there's not an allegation of selection for the library and so on and so forth. If they'd asserted that, we'd be having a slightly different argument.

And then the only other thing, your Honor, is while my colleague, Ms. -- Ms. Bengfort, was up, I was actually able to pull up the transmittal email, and the transmittal email for that December letter was, in fact, sent to Mr. Newell.

THE COURT: Okay. Going back to this issue on '315, they argue that they -- they're not arguing that you actually have accelerometers. They're arguing equivalence, right.

MR. SAULSBURY: They do make the -- they do make an assertion of equivalence in their opposition.

THE COURT: Right.

MR. SAULSBURY: but that is with respect to a different claim limitation. That is with respect to the use of stenography (sic).

With respect to the claim limitation requiring --

THE COURT: Steganography?

MR. SAULSBURY: Yes, steganography, thank you.

THE COURT: Stenography --

MR. SAULSBURY: Not to be confused with stenography, that's right.

THE COURT: -- is transcript taking.

MR. SAULSBURY: There's an additional syllable, although I think it's a related root, but thank you for -- you're right. I -- I dropped a syllable.

But, to be clear, there's -- there's two bases for our motion with respect to this patent. The first one is that -- is the claim limitation requiring embedding inertial measurement. That one they haven't addressed at all with Doctrine of Equivalence or otherwise, and that is sufficient to dismiss that patent.

The second issue, which is also an independent basis to dismiss, is that although they assert that there -- that the steganography requirement is met under the Doctrine of

Equivalence, it's literal -- if you just -- just an assertion. It says uses techniques equivalent to steganography. We know that that is insufficient. The ALD Social case is probably the -- the most directly on point. Counsel I think in their opposition sort of at least implicitly acknowledges that much, and that case makes clear that you have to do more than just assert equivalence, right. You have to have factual allegations supporting an inference, for example, that the elements of the Doctrine of Equivalence claim are met, like it operates in substantially the same way, substantially the same functions, substantially the same --

THE COURT: I know the --

MR. SAULSBURY: Of course, your Honor. Just -- yes, thank you.

THE COURT: Okay. Well, the opposition brief explicitly says -- argues that the first amended complaint alleges that Parallel Domain's virtual camera system includes parameters equivalent to inertial measurement data. So, I think they're arguing equivalence both as to steganography and inertial measurement, at least in the briefing.

MR. SAULSBURY: Fair enough. I don't -- don't believe that I saw anything of substance in the amended complaint. But, regard -- even if there were something like

that, it's no different than with respect to steganography because it's a bare assertion of equivalence. We know that that just fails as a matter of law.

THE COURT: Okay. But if you look at -- I don't know if you got the claims chart, but if you look at -- I mean, they -- they didn't include the -- they didn't include the express language of inertial measurement data but it would be part of Element 1-E, the time bearing calibration information?

MR. SAULSBURY: That's right.

THE COURT: And their accusation is that it's, you know, the data includes sensor poses, position, orientation, the optics roll translation X, Y, Z, and transformation matrices embedding for each frame. I mean, he brief makes that more explicit and says, Well, they're saying that these parameters are equivalent to inertial measurement data, specifically positioned orientation and motion parameters of the virtual camera.

MR. SAULSBURY: So --

THE COURT: So, I mean, they don't say in the claims chart that these parameters are equivalent to the inertial measurement data, but they say -- they tie what's in the chart to their Doctrine of Equivalence argument.

MR. SAULSBURY: I'm glad you brought us to the claim chart because there's slightly different allegations

in each place.

In the claim chart, they're talking about virtual cameras. And, as we explained in our motion, that can't be -- that can't satisfy this particular limitation because this particular limitation explicitly says you're embedding the calibration information into the video sequence in realtime as the sequence of stereoscopic images are being recorded.

It's talking about embedding that inertial information into the physical cameras that are recording in the real world, and they just don't address that at all. That's not in their claim chart. It's not in their complaint.

THE COURT: All right. What's your response to all that?

MR. NEWELL: To all of that I would reference what your Honor's already cited to about the virtual camera system, the -- being a functional equivalent to inertial measurement data. We've discussed the position orientation and most parameters of that virtual camera, and I know the -- the term "inertial measurement data" has to be construed in -- in context of what their product does, and to some extent we believe those alleged enough to satisfy the elements for I guess 12(b)(6) motion, but there is some gap between what they know about what -- how their technology works and how we understand it to work, but it's on the

publicly information, so --

THE COURT: But if what you're citing to are parameters used by the virtual camera and not by the real camera, the real world camera in realtime, how is that plausible to show infringement with respect to what has to be doing the process in the claim, the realtime camera?

MR. NEWELL: I suppose it would be the physical sensors of that realtime camera.

THE COURT: Yeah, I think that's what they're arguing, right.

MR. NEWELL: Yeah.

THE COURT: And -- but the parameters that you cite in your claims chart, according to them, those are parameters used by the virtual camera, not by the -- the actual image sensors.

MR. NEWELL: So, your Honor, to -- essentially this kind of broadening, you would have to refer to both the brief and the claim chart for a full picture. You're right, virtual camera and the physical sensors.

THE COURT: Yeah, but how is it plausible to say, Well, these parameters are used by the virtual camera, and, therefore, they satisfy the limitation for what should be used in the actual real image cameras or real world cameras?

MR. NEWELL: Okay. Your Honor, to distinguish between the two cameras, I do have some limitation on the --

the analysis of the specification and the construction of the two.

THE COURT: Okay. Falling back on your argument that you would need discovery then, is that what you're saying?

MR. NEWELL: Yes, your Honor.

THE COURT: Okay. I -- Mr. Saulsbury touched on this earlier, but I didn't hear a direct response. Part of their argument is that in order to properly assert a Doctrine of Equivalence argument here, you also need to at least propose a plausible claim construction to support that. And, so, for this one and for steganography, you don't really propose a claim construction. You -- (a), do you agree that you need to propose a claim construction to make it plausible, and (b), do you have one?

MR. NEWELL: (b), no. We would have all of our -- what we have is in the four corners of that -- that document.

THE COURT: Do you agree that you should have provided a proposed claim construction to support the Doctrine of Equivalence assertion?

MR. NEWELL: Your Honor, I think that could be something that could be amended to be provided for this complaint -- if the Court so sees that it needs to be amended.

MR. SAULSBURY: And, your Honor, I -- I apologize. just a brief clarification. I think I must have misspoke.

THE COURT: Yeah.

MR. SAULSBURY: Our position is that there may well be circumstances where you have to propose a claim construction if there's a disputable claim construction in nature with respect to your Doctrine of Equivalence theory.

Here I don't even think we get that far. And, so, we're not arguing that their failure here is a failure to identify claim construction dispute. Instead, they don't even have any factual allegations from which you could draw the inference that there's a DOE theory at all because they don't address function way result for example or some other reason that would support an inference that what they point to is equivalent. There's -- there's just a mere assertion that it's equivalent.

And they didn't even identify what's supposedly equivalent. It just says uses techniques equivalent to steganography.

(Pause.)

THE COURT: You do argue a bare assertion of the claim construction dispute in the face of an implausible allegations of infringement does not suffice to avert dismissal.

MR. SAULSBURY: That's a hundred percent great,

your Honor. That wasn't specific to Doctrine of Equivalence. It's just that there -- there are various places there that they essentially argue you shouldn't dismiss this case because there's a claim construction dispute. And I think the law is pretty clear that that's not enough. You can't just sort of wave your hands and say, Oh, there's a claim construction dispute. You have to look at this thing move on, because, again, everyone would just assert that, right. Instead, what you have to do is put forward what that dispute is and then give it -- give the Court a choice to resolve the claim construction dispute.

Here there's not actually a dispute over the meaning of any terms. We're relying on the face of the plain language itself.

THE COURT: Okay. All right. So, Mr. Saulsbury raised stenography. We talked about it. So, but I didn't give you a chance to respond on that. So, the claims chart just says that they used techniques equivalent to steganography without anything else. So, what -- how is that a plausible assertion of the Doctrine of Equivalence infringement theory through steganography?

MR. NEWELL: For the sufficiency of the pleading stage, we believe that is met. So, I -- technically equivalent to steganography. Let's see, we do have the Parallel Domain and there's meta data into its rendering

outputs through techniques that accomplish the same function.

THE COURT: But what are those techniques?

MR. NEWELL: Well, from what we were able to obtain integrating data imperceptibly into the output is that we --

(Pause.)

MR. SAULSBURY: Sorry.

THE COURT: Silence your phones everyone.

MR. SAULSBURY: Sorry. That was an override, but I'm going to turn it off.

MR. NEWELL: -- to achieve the result of calibration information preserved in the video stream. So, from what were able to obtain, that's how we described it. I understand that defense counsel has a better understanding.

THE COURT: So, say that, integrating data imperceptibly into --

MR. NEWELL: The output.

THE COURT: -- the output?

MR. NEWELL: yeah, to achieve the same result, calibration information preserved in the video stream.

THE COURT: Okay. It's not in the chart, but assume that -- I mean, that's their contention, right, that that's their equivalence theory. Why isn't that enough?

MR. SAULSBURY: It -- it isn't facts that would support an inference that the elements of a Doctrine of Equivalent claim are met. That's what they would need.

THE COURT: Okay. I mean, integrating data imperceptibly into the output. Isn't that just another way of saying steganography? Isn't that what steganography is is hiding a message in something else?

(No response.)

THE COURT: No?

MR. NEWELL: We are saying that it does numerous things, but for the -- yes. Yes, your Honor, it is -- it's equivalent to saying we're going to --

THE COURT: Yeah. Okay. But then you're just saying they do it because they do it. I mean, it's kind of -- it's kind of circular, isn't it?

MR. NEWELL: I believe we say they do it in the effort to calibrate information preserved in their video stream. So, that would be the -- end of that sentence, right.

THE COURT: All right. Well, taking that whole sentence, why isn't that enough of an inference?

MR. SAULSBURY: So, I think the problem -- again, this is one of two limitations. It doesn't address the first limitation at all that we address.

But I think the other problem is that there's more to

the limitation. Just one moment.

(Pause.)

MR. SAULSBURY: So, the calibration data has to be embedded directly into the data stream, and I don't think that they have allegations of literal infringement nor of DOE infringement that addressed the explicit requirement of direct embedding. And -- and it's -- the other important thing is that like this is the calibration data that comes from earlier in the step, and they haven't -- they don't have sufficient allegations with respect to that calibration data in the first place.

In other words, like they have to tie together those two limitations. You have to get the calibration data from the physical cameras, and then that calibration data needs to be embedded directly into the data stream, and they haven't alleged facts to support an inference of that.

(Pause.)

THE COURT: Before I move on to the next issue, I just want to -- I just want to get clarification.

On Osaro, is it Plaintiff's contention that using multiple cameras satisfies the stereoscopic camera limitation, that any time you have multiple cameras, you have a stereoscopic camera?

MR. NEWELL: It may be stated more robustly there, but, yes, your Honor, to the -- to that extent, yeah.

THE COURT: Okay. I know you disagree with that, but I'll give you a chance to respond to that before I move on.

MS. BENGFORT: I mean, I think that statement's just facially implausible. You have multiple cameras in this room right now. I've got a camera on my phone. So does he. These are there. Those are -- does not mean it's capable of or actually records stereoscopic video.

And, again, I would just add the patent -- they're not claiming to have invented stereoscopic cameras or stereoscopic video. That is not the critical claim element by itself. It is the specific process embedding calibration data in realtime that is the critical element of the claim that we -- we point out, and there's absolutely nothing about the presence of multiple cameras that suggest the presence of that limitation.

THE COURT: Okay. All right. So, let's talk about indirect infringement.

So, Mr. Newell, why didn't you attach the demand letters to the complaint? That is pretty normal.

MR. NEWELL: We didn't attach it, your Honor. You're correct. That's something that we obviously could do is attach the demand letters, but they weren't attached at the current stage. So --

THE COURT: Okay. I mean, you know what your

demand letters say. Was there actual analysis of infringement by the accused products in -- by these asserted patents in those demand letters?

MR. NEWELL: They -- they identify the asserted patents. They asserted that the Defendant's software infringed on one or more of the claims, which is the Fernie (phonetic) standard, which requires only that a letter communicate a charge of infringement of specific patents by a specific product or a group of products.

THE COURT: Isn't Fernie a wilfulness case? That's not -- that goes to -- does that go to inducement? I don't think it does, but --

MS. BENGFORT: It does. Inducement requires knowledge -- knowledge of infringement and specific intent to infringe. So, we've got both.

THE COURT: All right. Well, you know what demand letters your client received. Is there an analysis of infringement in the demand letter that Osaro received?

MS. BENGFORT: I'm actually not aware of my client receiving a demands letter.

THE COURT: Oh, that's right.

MS. BENGFORT: We -- we point out in our motion that they had an incorrect address listed for Osaro on the complaints, which, again, to the diligence point, we point it out in our last motion to dismiss and they -- they didn't

even attempt to fix that.

THE COURT: So, that's right. Osaro says you addressed the letter -- at least the complaint says you sent the letter to 1045 Bryant, where -- which is an address that Osaro does not and has not had any connection to. So, what evidence -- what basis do you have for a Rule 11 pleading that you did send a demand letter to Osaro?

MR. NEWELL: Osaro --

THE COURT: And that they actually got it.

MR. NEWELL: That they actually -- yes, your Honor. I recognize what defense counsel has provided. I would -- let me see if I -- I think I actually have this. One moment, your Honor.

(Pause.)

MR. NEWELL: I should actually have access to the presuit demand letters. Obviously there's the one that went to the address that -- that may not have been received, and I'm trying to find the initial communication that's part of this process for us in my index. Let's see.

(Pause.)

MR. NEWELL: I'm looking at our proof of delivery, and I'm making sure I -- I'm looking at the one that corresponds to Osaro and not to --

(Pause.)

MR. NEWELL: Okay. What I would have would be the

-- the FedEx basically showing where it was delivered, but that would be the extent of what I have at my disposal presently to show proof of delivery. And, of course, I have the communication with Parallel following.

THE COURT: I mean, but have you or your client seen the document they're contending is the demand letter even if it was sent later or it somehow got to you?

MS. BENGFORT: We have not seen it, no.

THE COURT: Okay. All right.

Mr. Newell, how does the normal acts of providing documentation about your products and providing specs and training and promotion material, how does that induce infringement? At best it induces use of the product, but I don't see how that induces infringement.

MR. NEWELL: We say to the extent that those who are taking those steps would be participating in actions that we would contend infringe upon our patents. I guess in training, that's how we would describe that. And it encourages the use of a product that infringes on our patent.

THE COURT: Okay. But it's -- you would agree that that's at best inducing the use of the product, right? It's not actively inducing anyone to infringe?

MR. NEWELL: I'm not understanding the Court's distinction between the two. But what we would say is

inducing -- especially with it being -- to the extent that it is promotion, it would satisfy that element to the extent that the marketing material would be promotional.

THE COURT: You know the case law as well as I do here. I mean, the case law draws a distinction between promoting and inducing the use of a product versus promoting and inducing infringement of a patent, right?

MR. NEWELL: Yes, your Honor.

THE COURT: So, I -- I mean, if -- if your theory is that inducing the use of the product amounts to inducing infringement, you need to cite better case law. Do you have anything that says that that's sufficient?

MR. NEWELL: Everything that I would have would be already in our brief.

THE COURT: On contributory infringement, the complaints refer to modules in the accused software that had substantial noninfringing uses. So, what are those modules?

MR. NEWELL: Let's see. I know we specifically identify SiteWorks synthetic data generation modules and Parallel's virtual camera configuration. Beyond that, we don't have specifically in our --

THE COURT: Okay. And those are not -- well, and we had a question earlier. Those phrases, virtual camera configuration tool, is that a phraseology or a nomenclature used by Parallel to describe its own products or is that --

MR. NEWELL: I believe so, your Honor, from the research that we've done from the publicly available information.

THE COURT: Mr. Saulsbury, is that correct? Does your client refer to its products as having a module called a virtual camera configuration tool?

MR. SAULSBURY: That particular phrasing doesn't come to mind. It's something I asked about, and nothing specific came to mind. It's hard to sort of truly negate that, if you know what I mean.

THE COURT: All right. And we had the question earlier about where the phrase "synthetic data generation module came from" and the -- you represented that you thought it came from Osaro's documentation, but your colleague here said it doesn't. So --

MR. NEWELL: I would have to have some additional information, but I don't have anything that's not in the four corners of either of these documents.

THE COURT: You would agree that the -- other than saying that these modules have non-infringing uses, you don't really give any pleading in the complaint as to why they have not -- or, you know, what they're not -- why they have no substantial non-infringing uses?

MR. NEWELL: No. It's not within our --

THE COURT: Okay. And in the opposition brief you

cite in this context of contribute, you cite paragraphs 74 and 76 to 77 of the Osaro first amended complaint, but that complaint doesn't have those paragraphs.

MR. NEWELL: Yeah, same issue, your Honor, from earlier, correct.

THE COURT: All right. And then, again, you make the allegation I think in the claims chart that the Osaro camera control feature is "custom built for the patented process". Where did that come from?

MR. NEWELL: From the -- from what we discerned from the publicly available information.

THE COURT: Okay. Response to that?

MS. BENGFORT: Well, I don't deny that Osaro uses cameras, but I -- I could not tell from this language what the camera controlled feature they're referring to is.

THE COURT: Okay. Okay. Anything else on the indirect infringement from any party?

MS. BENGFORT: No. I think we're happy to rest on the briefing on that.

MR. SAULSBURY: Same, your Honor. Thank you.

MR. NEWELL: Plaintiffs would rest on the briefing.

THE COURT: All right. Anything else on direct infringement from any party?

(Pause.)

MR. NEWELL: Rest on the briefing as well.

MS. BENGFORT: Same here. Thanks, your Honor. Oh, no. Go ahead.

MR. SAULSBURY: I'll keep it extremely brief. It's just that we heard references to leave to amend. From our perspective, if you take a look at their opposition briefing, they haven't carried their burden to establish why leave would be appropriate. They haven't addressed why it would be non-futile. We think it would be completely inappropriate under the circumstances, but that's the only other thing I had.

THE COURT: Okay. With regard to the intent issue, we focused on it in the context of inducement, but I think everybody agrees that the same analysis applies to the willfulness.

MR. SAULSBURY: Correct, your Honor.

THE COURT: Is that right?

MR. NEWELL: Yes, your Honor.

THE COURT: All right. Everybody -- on the TRO "cause of action", everybody agrees that that's not a cause of action, right? It's a claim for remedy, right?

MR. NEWELL: Yes, your Honor.

THE COURT: And it should be -- Plaintiff says we should just interpret it as such. Defense says, yeah, okay, right? I mean, as long as everybody understands that it's

not a separate cause of action and it rises or falls with the actual causes of action, I think the Defense is okay with it?

MR. SAULSBURY: That's fine from Parallel's perspective, your Honor.

MS. BENGFORT: Yeah. I would just say that I think this is another example of something that could have easily been cured in the amended complaint just by restyling it. And I think, you know, to the point about whether leave to amend should be granted, there's just a million things like this that we pointed out that, you know, Plaintiff didn't even attempt to fix at all and, you know, Zoom versus SIFE says that when they've already invented the complaint, the Court has broad discretion to deny leave to amend, and I just don't think they've demonstrated any diligence or any reason why they should be granted that. I'll leave it at that.

THE COURT: All right. Response on leave to amend?

MR. NEWELL: Your Honor, I would say at least from our in, I have the I guess privilege to know that further work has been done to the extent of curing some of these deficiencies that have been pointed out, and I don't think that it will be futile based on what we've been able to develop since the time of the filing of the first amended

complaint.

Also, that amended complaint didn't come after the foresight being in the presence of your Honor or anyone else. We just attempted to make those corrections at that time. There was a -- I believe we're still within a -- a position of being able to make those corrections without causing substantial prejudice, anything of that nature.

THE COURT: Any rebuttal?

MR. SAULSBURY: Just very briefly. These errors were pointed out multiple times in advance of the amended complaint, in advance of us filing the motion. They had every opportunity to address them. There's no reason they couldn't have addressed them earlier.

THE COURT: I mean, have you -- have you provided the proposed newly amended complaint to the Defendants to try to see if they'd agree to it?

MR. NEWELL: No, your Honor.

THE COURT: Okay.

MS. BENGFORT: I would just add that we already filed a motion to dismiss. And, so, they had the benefit of that motion as well as our letter, and it does take substantial time and expense to put those together.

THE COURT: All right. In the original motion papers, Defense points out that the complaint asks for lost profits and argues irreparable harm from loss of competitive

advantage.

As I understand, your client is not a competitor in the industry. So, I don't understand what the basis is for arguing loss of competitive advantage and lost -- and lost profits here.

MR. NEWELL: Your Honor is correct. The damages, of course, would be ascertained later, likely wouldn't include some aspects -- that aspect that was included in that --

THE COURT: Okay.

MR. NEWELL: -- original construction.

THE COURT: All right. I take it by that to mean that the Plaintiff would be relying on reasonable royalty in this case, right?

MR. NEWELL: Yes, your Honor.

THE COURT: Okay. Okay. Well, thank you all for preparing for this long argument. It went longer than I thought it would.

When is our next -- do we have a CMC schedule? What's our next event on the calendar? Is there -- is there one scheduled or not?

MS. BENGFORT: There is not one currently scheduled, your Honor. I believe you vacated the CMC when we put together the joint plan.

THE COURT: Okay. All right. Submitted?

MR. SAULSBURY: Thank you, your Honor.

MS. BENGFORT: Thank you, your Honor.

MR. NEWELL: Thank you, your Honor.

THE COURT: Okay. An order will issue in due course.

MR. NEWELL: Appreciate it.

THE COURT: Thank you.

THE CLERK: We're off the record in this matter. Court's in recess.

(Proceedings concluded at 2:58 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Thursday, March 19, 2026