# EXHIBIT 1

Coblentz
Patch Duffy
& Bass LLP

One Montgomery Street, Suite 3000
San Francisco, CA 94104-5500
T 415 391 4800
coblentzlaw.com

Christopher J. Wiener
D (415) 293-6472
cwiener@coblentzlaw.com

April 9, 2026

**VIA E-MAIL**

Christopher J. Fry, Esq.
Fry Law Corporation
4227 Sunrise Boulevard, Suite 200
Fair Oaks, CA 95628
cfry@frylawcorp.com
(916) 291-0700

Michael Gregory Newell, Esq.
225 Ray Avenue, Suite 200
Fayetteville, NC 28301
mnewell@theaiia.org
(336) 355-6897

Re: *Artificial Intelligence Industry Association, Inc. v. FANUC America Corp.*
Case No. 4:26-cv-00860-YGR (N.D. Cal.)

Dear Messrs. Fry and Newell:

I write regarding Artificial Intelligence Industry Association, Inc. ("AIIA")'s complaint alleging that FANUC America Corp. ("FANUC") indirectly infringes U.S. Patent No. 11,257,272 ("the '272 patent").

As with its complaints against other defendants, AIIA has failed to exercise anything close to the level of diligence and pre-filing investigation required of plaintiffs in federal courts. Worse yet, as detailed below, AIIA has been on notice since well before filing its complaint against FANUC that the accused software (*i.e.*, Osaro's SightWorks software) does not infringe the '272 patent; FANUC does not indirectly infringe; AIIA cannot recover from both Osaro and FANUC; and the asserted patent is unenforceable, invalid, and not patent eligible. Simply put, AIIA has known for months that its claims are objectively baseless.

Accordingly, FANUC demands that AIIA immediately withdraw its complaint. If it fails to do so, FANUC will seek attorneys' fees and sanctions under 35 U.S.C. § 285 and/or Rule 11 of the Federal Rules of Civil Procedure.

## I. AIIA Has Known Since October 2025 That Osaro Does Not Infringe the '272 Patent

AIIA does not allege that FANUC directly infringes the '272 patent. Rather, AIIA's allegations rest entirely on its allegations against Osaro, Inc. ("Osaro"). In particular, AIIA alleges that "***Osaro*** directly infringes one or more claims of the '272 patent under 35 U.S.C. [§] 271(a) by using the infringing methods internally and by offering them to third parties via its commercial SightWorks platform." (ECF No. 1 ¶ 28.) AIIA admits that FANUC's alleged "inducement and

contributory infringement of the ’272 patent ***depends upon this underlying direct infringement by Osaro*** and/or ***third parties who deploy the FANUC-Osaro integrated solution***.” (*Id.* (emphasis added).)

While AIIA has argued that it needs discovery to confirm whether Osaro infringes, had AIIA done any investigation, it would have known that publicly available information makes clear that Osaro’s software does not infringe the ’272 patent. The ’272 patent is directed to the creation of “synthetic image data” that can be used in training data sets for machine learning. *See* Ex. A (’272 patent) at Title; *id*. at Abstract (“Synthetic image datasets generated by the systems and methods described herein are used to train machine learning systems”). As Osaro’s counsel explained at the February 17, 2026 hearing on Osaro’s motion to dismiss, AIIA could and should have accessed a trial of Osaro’s software before filing a complaint to assess whether the software generates synthetic images. In any event, AIIA has been on actual notice since at least October 2025 that Osaro’s software uses real image data rather than synthetic images, and thus cannot infringe the ’272 patent.

**A. Osaro informed AIIA in October 2025 that it does not use synthetic images.**

In its October 27, 2025 letter, Osaro explained that it does not use synthetic images as required by the ’272 patent—but rather uses real images obtained from cameras placed around a physical packaging environment. (Ex. B at 2-3.)

In particular, Osaro explained that “SightWorks is trained solely using the type of ‘manually captured’ images that the ’272 patent acknowledges were conventional. In particular, SightWorks uses cameras and other sensors to manually collect real images and data from specific, real packaging environments. SightWorks then uses *that data* to train its software to detect errors and adapt to changing conditions. At no point does SightWorks create synthetic images or use any such images to train its software.” (*Id*. at 3.)

Osaro attached as Exhibit 1 to its October 2025 letter marketing material that explains the operation of Osaro’s software and is available at the following website: https://www.controldesign.com/print/content/55271619. That material makes clear that Osaro’s software relies on real-world interactions:

> Osaro’s patented depth-perception technology uses self-supervised learning, enabling the robot to estimate depth by analyzing images and arm movements from both successful

Coblentz Patch Duffy & Bass LLP



> and failed grasping attempts. By repeatedly attempting to grasp objects and analyzing the resulting images and arm positions, the robot can estimate the depth of objects.
>
> "Imagine a robot trying to grab a small toy in a classic warehouse tote," explained Ross. "Each time it tries to grasp it learns a little more about how far away the toy is. Eventually, it will be able to successfully determine the distance of the toy every time. Most importantly, it does this automatically without a human in the loop to annotate the information required to train a machine-learning model."

(*Id.* at 8-9.) Osaro then explained in its letter:

> This means that, among other things, SightWorks cannot meet the requirements in Claim 17 of: (1) "constructing . . . a first synthetic image scene having an image class specified in a first scene metadata file, the constructing comprising: selecting a background image from the database of background images, wherein the background image is associated with the image scene class and arranged in a background portion of the first synthetic image scene according to instructions included in the first scene metadata file"; (2) "constructing a second synthetic scene having the image scene class selected for the first synthetic image scene, the second synthetic image scene constructed according to instructions included in a second scene metadata file"; and (3) "assembling synthetic images and the additional image data for the first and second synthetic image scenes in a training dataset associated with the image scene class, wherein the training dataset is used to train a machine learning system to perform a computer vision task." Accordingly, AIIA has no basis to allege that OSARO infringes claim 17—or any claim—of the '272 Patent as every claim requires some form of a method for "generating synthetic image data."

(*Id.* at 3.)

**B. Osaro's patent confirms that it does not use synthetic images.**

The marketing document that Osaro sent AIIA in October 2025 references Osaro's U.S. Patent No. 12,236,340 (Ex. C), which describes in detail how Osaro's SightWorks software works—and confirms that it does not perform any of the claimed steps of the '272 patent.

In particular, the '272 patent recites a method that *inter alia*:

- Constructs a "synthetic image scene" from a "background image from the database of background images";
- Arranges "3D models in a foreground portion of the synthetic image scene[,]"; and
- Uses a "virtual camera [to] captur[e] a camera view of the first synthetic image scene[.]" (Ex. A at claim 17.)

In contrast, Osaro's patent describes a process that:

- Uses a real warehouse as the background:
  - "Training data consists of images and end effector positions recorded while a robot attempts grasps in a pick-and-place environment." (Ex. C at Abstract.)
- Has an actual robot grasp actual objects in an actual picking bin in the foreground:
  - Using "a Kuka LBR iiwa 14 R820[1] fitted with a 34 mm wide suction tooltip" (*id.* at 7:7-9);
  - Employing a camera that is "mounted directly over the picking bin" (*id.* at 7:9-11);
  - Using "tactile interactions (e.g., grasps or 'pokes') with the environment" (*id.* at 5:48-50);
  - "Robots attempted grasps on well over 100 unique objects representative of stock keeping units (SKU) encountered in real world environments. This object set included, but was not limited to regular boxes, items with reflective or transparent surfaces, clamshells, and aerosol bottles" (*id.* at 7:17-21); and
  - The software learns "from interacting with a physical environment" (*id.* at 5:19-23).
- Uses a physical camera to take pictures of the scene when the robot arm has stopped:

[1] My Kuka, LBR iiwa 14 R820, https://my.kuka.com/s/product/lbr-iiwa-14-r820/01t58000002hnktAAA?language=en_US&tab=Details (last visited Mar. 19, 2026).

- "Intel RealSense camera[2] . . . gathered images" (*id.* at 7:9-11); and

- "[G]enerating a training image of the three-dimensional environment at the time when the robot's end effector has stopped moving in the three-dimensional environment (FIG. 7, operation 710)" (*id.* at 12:50-53).

Significantly, AIIA's patent and Osaro's patent take opposite views on the effectiveness of using real-world images to train AI models. AIIA's patent claims that there are problems associated with the "conventional" approach of using "real" or "manually captured" images in training data sets, including that those images are "scarce" and may be difficult to acquire. (Ex. A at 2:5-51, 3:47-60, 5:50-54, 7:40-42.) AIIA's patent claims that "synthetic image data is just as effective as manually captured images for training neural networks and other machine learning systems." (*Id*. at 2:39-51.) The Osaro patent says the opposite. It explains that "[a]lthough ***gathering . . . physical interaction data is expensive, it is necessary for training and routine operation of state of the art manipulation systems***." (Ex. C at Abstract (emphasis added).) That is, Osaro's patent specifically explains that using real images from real interactions is essential to training Osaro's software: using synthetic images is not nearly as effective.

In short, publicly available information confirms that Osaro's product operates in the opposite way that AIIA's patent claims. If AIIA's complaint survives a motion to dismiss (which is doubtful), fact discovery would only confirm that Osaro does not directly infringe the '272 patent. Failing to dismiss AIIA's complaint now only prolongs the inevitable and serves to rack up the attorneys' fees that AIIA will have to pay.

## II. <u>AIIA's Indirect Infringement Claims Are Also Meritless</u>

AIIA's indirect infringement claims fare no better. As discussed above, they rest entirely on meritless claims against Osaro. Compounding that issue, AIIA appears to misunderstand the elements of a contributory infringement claim, and makes no allegation sufficient to support an induced infringement claim.

---

[2] RealSense, Product Datasheets (Stereo Depth Cameras & Stereo Depth with IR Pass Filter, https://www.realsenseai.com/product-datasheets/ (last visited Mar. 19, 2026).

### A. FANUC cannot contributorily infringe the ’272 patent.

“Contributory infringement occurs if a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that ‘material or apparatus’ is [1] material to practicing the invention, [2] has no substantial non-infringing uses, and [3] is known by the party ‘to be especially made or especially adapted for use in an infringement of such patent.’” *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (citation omitted). FANUC does not and cannot contributorily infringe the ’272 patent because its M10iD/12 six-axis robot arm is not material to practicing the ’272 invention; has substantial non-infringing uses; and is not especially adapted for use with the accused Osaro software.

***First***, AIIA asserts that FANUC contributorily infringes the ’272 patent by providing “robotic hardware and associated technical integration services that, when combined with Osaro’s software, form a material component of systems that, upon information and belief and subject to confirmation through discovery, may practice the methods claimed in the ’272 patent.” (ECF No. 1 ¶ 27.) As an initial matter, “technical integration services” cannot be the basis for a contributory infringement claim; the statute requires the provision of “a component of a patented machine, manufacture, combination or composition, or a material or apparatus[.]” 35 U.S.C. § 271(c). Services do not qualify. Similarly, AIIA alleges that FANUC’s provision of “demonstration facilities, marketing support, and ASI network coordination constitutes offering to sell and selling components especially made for use in infringement of the ’272 patent.” (ECF No. 1 ¶ 27.) But again, none of these things are a “component,” “material,” or “apparatus” as required by the statute.

As to the accused “robotic hardware,” there can be no contributory infringement when the accused component is not material to the invention. *See* 35 U.S.C. § 271(c) (“Whoever offers to sell or sells within the United States . . . a material or apparatus for use in practicing a patented process, constituting a ***material part of the invention*** . . . shall be liable as a contributory infringer.”) (emphasis added); *see also Cleveland Clinic Found. v. True Health Diagnostics, LLC*, No. 15 CV 2331, 2016 WL 705244, at *8 (N.D. Ohio Feb. 23, 2016), *aff’d*, 859 F.3d 1352 (Fed. Cir. 2017) (accused lab reports not material to claims directed to testing protocol for cardiovascular disease because reports only reflected test results, not the claimed testing method); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1331 (Fed. Cir. 2010) (no contributory infringement because accused product that delivered *defragmented* data messages was not material to Wi-Fi transmission protocol invention that required *fragmentation*). Here, the ’272 patent recites a method for generating synthetic image data for use in a training data set to “train a machine learning system to perform a computer vision task.” FANUC’s robotic hardware is

not material to the ’272 patent at least because the claims make no reference to hardware besides a processor—robotic or otherwise. Thus, the components that FANUC provides, by definition, cannot be a material part of the claimed invention.

***Second***, AIIA alleges that the FANUC-Osaro “***integrated systems*** have no substantial non-infringing use in the context of the FANUC-Osaro collaboration.” (ECF No. 1 ¶ 27 (emphasis added).) But this is not the relevant test for contributory infringement. What matters is whether FANUC sells or offers to sell a component that by itself has no substantial non-infringing uses. *See Fujitsu*, 620 F.3d at 1326 (Fed. Cir. 2010) (“To establish contributory infringement, the patent owner must show . . . that ***the component*** has no substantial noninfringing uses.”) (emphasis added). FANUC sells robots—not “integrated systems.” There is no dispute that FANUC’s robots have non-infringing uses: AIIA does not accuse them when integrated with non-Osaro software.

***Third***, AIIA alleges that “FANUC knows that its robotic hardware is specially adapted for use with Osaro’s software for warehouse automation applications.” (ECF No. 1 ¶ 27.) But, as FANUC’s General Counsel Bernard Lourim informed you, FANUC “sell[s] ***standard robot product*** to customers who might purchase, sell, or use Osaro software separately[.]” (Ex. D at 3 (Oct. 31, 2025 B. Lourim Email to R. McDonald) (emphasis added).) That is, the robotic hardware FANUC sells to Osaro is not specially adapted for use with Osaro’s software. But even assuming that AIIA’s factual allegation were correct (which it is not), it would not be sufficient to establish contributory infringement since—as discussed above—the ’272 patent does not claim “robotic hardware,” so even specially adapted robotic hardware cannot, by definition, be a material part of the claimed invention.

Simply put, FANUC cannot contributorily infringe the ’272 patent, and AIIA has no good-faith basis for maintaining its contributory infringement claim.

**B. FANUC does not induce infringement of the ’272 patent.**

To state a claim for induced infringement, a plaintiff must plead facts plausibly showing (1) direct infringement by a third-party, (2) that the accused inducer had knowledge of infringement, and (3) that the accused inducer specifically intended for that infringement to occur. *See P2i Ltd. v. Favored Tech USA Corp.*, No. 23-cv-01690-AMO, 2024 WL 4294652, at *6 (N.D. Cal. Sept. 24, 2024). As discussed above, AIIA will not be able to prove direct infringement by Osaro. Nor can it prove that FANUC has knowledge that Osaro directly infringes the ’272 patent, or that FANUC specifically intended to encourage infringement.

**1. FANUC has no knowledge of infringement of the ’272 patent.**

AIIA admits that it itself does not know whether Osaro infringes. In particular, AIIA alleges: “[u]pon information and belief, and ***subject to confirmation through technical discovery***, Osaro’s SightWorks software ***may*** utilize methods for generating synthetic image data for training machine learning models that infringe [the ’272 patent].” (ECF No. 1 ¶ 1 (emphasis added)); *see also id.* ¶ 25 (“Upon information and belief, and ***subject to confirmation through technical discovery***, Osaro’s SightWorks software and AutoModel AI engine ***may*** generate synthetic image data for training machine learning models used in robotic vision systems, and such generation, when practiced by Osaro and/or end users deploying the FANUC-Osaro integrated solution, ***may*** constitute direct infringement of the ’272 patent.”) (emphasis added).) While AIIA points in its complaint to its October 2025 letter that allegedly put FANUC on notice of infringement (*id.* ¶ 26), FANUC cannot possibly have knowledge of infringement based on AIIA’s letter when AIIA itself does not know whether FANUC infringes.

AIIA also points to “FANUC’s knowledge that Osaro uses simulated data to train ML models (as publicly stated by Osaro’s CEO)[.]” (*Id.*) But a statement about “simulated data” is irrelevant since it does not refer to the use of the “synthetic images” required by the ’272 patent. This is particularly true when, as discussed above, Osaro prides itself in using real images collected from real world interactions to train AI models—not synthetic images. In short, AIIA cannot establish knowledge of infringement when AIIA has pointed to nothing to contradict Osaro’s representations, marketing materials, and patent that establish non-infringement.

**2. FANUC never acted with specific intent to induce infringement.**

Even if FANUC knew that Osaro’s software infringed AIIA’s patent (which it does not), FANUC’s activity of selling robots to Osaro is insufficient as a matter of law to establish that FANUC acted with intent to induce infringement. That is because FANUC’s robots undisputedly have substantial non-infringing uses. “Especially where a product has substantial noninfringing uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent.” *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003); *see also epicRealm Licensing, LLC v. Autoflex Leasing, Inc.*, 492 F. Supp. 2d 608, 639 (E.D. Tex. 2007) (“[T]here can be no liability for active inducement when the actions alleged to induce infringement could also lead to noninfringing activity, and there is no encouragement of the infringing activity in particular.”).

Coblentz Patch Duffy & Bass LLP



Further, AIIA is wrong that FANUC's alleged "active promotion and integration of Osaro's software with FANUC robotic hardware constitutes inducement of infringement under 35 U.S.C. [§] 271(b)." (ECF No. 1 ¶ 26.) As the Court made clear during the February 17, 2026 hearing on Osaro's motion to dismiss, allegations that a party promotes ***use*** of a product is not sufficient allege that the party induces ***infringement*** of a product. Ex. F at 58:10-59:14 ("THE COURT: You know the case law as well as I do here. I mean, the case law draws a distinction between promoting and inducing the use of a product versus promoting and inducing infringement of a patent"); *see P2i Ltd.*, 2024 WL 4294652, at *7 (finding no plausible inducement when complaint alleged defendant provided product info on a device used to infringe a claimed method "at trade shows, via promotional videos, . . . in [] advertisements and/or other public content" without stating how defendant "specifically encouraged infringement"). In short, the activities that AIIA alleges FANUC engaged in do not constitute induced infringement. Both its indirect infringement claims are equally meritless.

## III. <u>AIIA Has Been on Notice of Various Other Issues With Its Claims for Months</u>

AIIA has failed to heed warnings from other defendants that it cannot recover from both Osaro and FANUC, and that the asserted patent is unenforceable, invalid, and not patent eligible.

### A. AIIA has known since October 2025 that it cannot recover against both Osaro and FANUC.

In its October 2025 letter, Osaro informed AIIA that its infringement suit against Osaro forecloses its ability to additionally recover damages from FANUC because it is prohibited by law from recovering doubly for the same infringing conduct. (Ex. B at 1 (citing *Grecia v. Target Corp.*, No. 17-CV-00323-YGR, 2018 WL 4283358, at *2 (N.D. Cal. Sept. 7, 2018) (holding "the double-recovery rule would prevent [the patentee] from obtaining an additional award for use of the same infringing technology" and staying case in view of earlier filed infringement action alleging the same infringing conduct).) AIIA ignored this warning and filed suit against FANUC anyway.

### B. AIIA has known since October 2025 that the '272 patent is anticipated by the prior art.

On October 15, 2025, Parallel Domain sent AIIA a letter that put AIIA on notice that the '272 patent is anticipated by the prior art. The letter explained:

> Not only is Plaintiff's infringement claim foreclosed, but the claims of the '272 Patent are in any event anticipated.
>
> As just one example, NVIDIA's Deep Object Pose Estimation (DOPE) was disclosed in 2018. DOPE receives a database of background-images (including a 10,000-image subset of Microsoft COCO) together with three-dimensional models (the YCB set) and texture materials. It then constructs scenes by "placing the foreground objects … in front of a random background" and randomly varying overlaid textures, backgrounds, object poses, lighting, and noise. It also places a virtual camera whose pose (azimuth, elevation, and distance) and known intrinsics define the image plane, and then renders that projection to pixels using Unreal Engine/NDDS. Finally, the resulting synthetic images are appended to—and used as—the training dataset for the pose-estimation network ("we train only on synthetic data"), with the paper's photorealistic set built from specific Unreal Engine environments (kitchen, sun temple, or forest)—i.e., subsets of images sharing a common image-scene class used for training ("synthetic data"), with the paper's photorealistic set built from specific Unreal Engine environments (kitchen, sun temple, or forest)—i.e., subsets of images sharing a common image-scene class used for training. In short, DOPE meets every limitation of claim 1 of the '272 Patent.
>
> Numerous other pre-2019 references also clearly anticipate—or at minimum render obvious—the asserted limitations, including Su et al., *Render for CNN* (ICCV 2015); Dosovitskiy et al., *FlowNet / "FlyingChairs"* (ICCV 2015); Peng et al. *Learning Deep Object Detectors from 3D Models* (ICCV 2015); Gaidon et al., *Virtual Kitti* (CVPR 2016); Varol et al., *SURREAL* (CVPR 2017); and Tremblay et al., *Training Deep Networks with Synthetic Data: Bridging the Reality Gap by Domain Randomization* (CVPR 2018 Workshops).

(Ex. E at 4-5 (Oct. 15, 2025 Letter (footnote omitted)).) Again, AIIA ignored this warning.

### C. AIIA has known since October 2025 that the '272 patent is unenforceable.

In its October 15, 2025 letter, Parallel Domain put AIIA on notice that the '272 patent is also unenforceable, stating:

> A basic review of the '272 Patent file history reveals another critical problem for Plaintiff. the [*sic*] applicants did not file any Information Disclosure Statements or even cite a single reference during prosecution of the '272 Patent application. Applicants'

> total failure to provide any prior art to the Patent Office—especially in view of the plainly material prior art described above—raises serious concerns regarding the applicants' compliance with their duty of candor and good faith. Indeed, the "single most reasonable inference" of applicants' decision not to provide *any* prior art to the Patent Office is an intent to deceive in order to obtain issuance of the patent. If this litigation continues, Parallel Domain intends to pursue discovery into the prosecution of the '272 Patent, which we expect to uncover additional evidence of an intent to deceive the Patent Office. Such conduct would render the '272 Patent unenforceable for inequitable conduct. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290-1292 (Fed. Cir. 2011).

(Ex. E at 5.) AIIA ignored this warning too.

### D. AIIA has known since December 2025 that the '272 patent is invalid under Section 101.

In its December 4, 2025 motion to dismiss, Elementary Robotics put AIIA on notice that the '272 patent is invalid under Section 101.

> [Step1]: The claims of the '272 patent are directed to the abstract idea of storing and creating images and image data. Representative claim 17 generally recites a method for generating synthetic image data using standard image and camera components (background images, 3D models, texture materials, scene metadata, and camera setting files; basic processors and a computer graphics engine) and then using a training dataset of the images to train a machine learning system. (FAC, Ex. A at cl. 17.) The Federal Circuit has repeatedly found similar claims abstract and has recently clarified that such bare-bones recitation of machine learning as a tool cannot save claims from abstraction. *See*, *e.g.*, *AI Visualize v. Nuance Commc'ns*, 97 F.4th 1371 (Fed. Cir. 2024) (claims directed toward storing and creating virtual images/views to be patent ineligible); *Recentive Analytics v. Fox*, 134 F.4th 1205 (Fed. Cir. 2025) (claims relying on generic machine learning to carry out generation of schedules and network maps to be patent ineligible). . . .
>
> Claim 17 is directed toward nothing more than storing image data and then putting together that image data to generate other images. This abstract practice is analogous to long-standing human activity, including arts-and-crafts, such as scrapbooking, where

> different images, objects, textures, etc. can be combined to generate an image on the page. . . .
>
> The claims do not recite improvements to technology, but instead merely use result-based language to apply the abstract idea in a computer context using generic computer components, as further discussed for Step Two below. "[M]ere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology." *Credit Acceptance v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017); *see also Recentive,* 134 F.4th at 1216 (generic machine learning does not save claims from abstraction). . . .
>
> [Step 2] Here, stripping away the abstract concept, all that remains are generic components and concepts—such as a "processor," "database," "3D models," "computer graphics engine," "image projector," "virtual camera," "synthetic image," and "machine learning system"—that were well-understood, routine, and conventional by the time of the claimed invention.

(Defendants' MPA ISO Motion to Dismiss, *AIIA v. Elementary Robotics, Inc.,* No. 2:25-cv-08297-HDV-E, at 8-13 (C.D. Cal. Dec. 4, 2025), ECF No. 22-1.) AIIA apparently recognized that Elementary Robotics is right since AIIA dismissed its complaint prior to the hearing on Elementary Robotics' motion to dismiss. Despite knowing that the '272 patent is not patent eligible under Section 101, AIIA has continued to pursue its claims against FANUC.

## IV. **Conclusion**

Because AIIA has no good-faith basis to maintain this action, it must immediately withdraw its complaint. Please confirm by April 17, 2026 that AIIA will agree to voluntarily dismiss this suit with prejudice. Should AIIA fail to do so, FANUC reserves its right to seek its fees and costs in litigating this action.

Very truly yours,

Christopher J. Wiener

Enclosures

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

ARTIFICIAL INTELLIGENCE INDUSTRY ASSOCIATION, INC.,
Plaintiff,
vs.
OSARO, INC.,
Defendant.

No. C 25-07170-PHK

ARTIFICIAL INTELLIGENCE INDUSTRY ASSOCIATION, INC.,
Plaintiff,
vs.
PARALLEL DOMAIN, INC.,
Defendant.

No. C 25-07658-PHK

San Francisco, California
Tuesday, February 17, 2026

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 1:37 - 2:58 = 1 HOUR 21 MINUTES

APPEARANCES:

For Plaintiff:
225 Ray Avenue, Suite 200
Fayetteville, North Carolina 28301
BY: MICHAEL G. NEWELL, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

For Osaro, Inc:

Thompson Hine, LLP
155 Bovet Road
Suite 600
San Mateo, California 94402
BY: BETHANY D. BENGFORT, ESQ.

For Parallel Domain, Inc.:

Morrison Foerster
425 Market Street
San Francisco, California 94105
BY: TIMOTHY SAULSBURY, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/ Transcriber
echoreporting@yahoo.com

Tuesday, February 17, 2026 1:37 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: Now calling Civil Matters 25-7170 and 25-7658.

Counsel, when speaking, please approach the podiums and state your names for the record and then stay -- stay up here standing when you're speaking. Thank you.

THE COURT: All right. Let's have appearances.

MR. NEWELL: Your Honor, I'm Michael Newell for the Plaintiff, AI.

THE COURT: Good afternoon.

MR. SAULSBURY: Good afternoon, your Honor. On behalf of Parallel Domain, I'm Tim Saulsbury from the Morrison Foerster Firm, and I'm joined by a colleague who represents another Defendant. I'll let her introduce herself.

MS. BENGFORT: Thank you.

Good afternoon, your Honor. Bethany Bengfort on behalf of Osaro, Inc., from the Law Firm of Thompson Hine, LLP.

THE COURT: Good afternoon to you all. Okay.

So, let's talk about -- let's start with the law first. Plaintiff cites Disk Disease Solutions for the propositions that Federal Circuit said identifying the accused products as attaching these sort of patents and just alleging baldly

-- the FedEx basically showing where it was delivered, but that would be the extent of what I have at my disposal presently to show proof of delivery. And, of course, I have the communication with Parallel following.

THE COURT: I mean, but have you or your client seen the document they're contending is the demand letter even if it was sent later or it somehow got to you?

MS. BENGFORT: We have not seen it, no.

THE COURT: Okay. All right.

Mr. Newell, how does the normal acts of providing documentation about your products and providing specs and training and promotion material, how does that induce infringement? At best it induces use of the product, but I don't see how that induces infringement.

MR. NEWELL: We say to the extent that those who are taking those steps would be participating in actions that we would contend infringe upon our patents. I guess in training, that's how we would describe that. And it encourages the use of a product that infringes on our patent.

THE COURT: Okay. But it's -- you would agree that that's at best inducing the use of the product, right? It's not actively inducing anyone to infringe?

MR. NEWELL: I'm not understanding the Court's distinction between the two. But what we would say is

inducing -- especially with it being -- to the extent that it is promotion, it would satisfy that element to the extent that the marketing material would be promotional.

THE COURT: You know the case law as well as I do here. I mean, the case law draws a distinction between promoting and inducing the use of a product versus promoting and inducing infringement of a patent, right?

MR. NEWELL: Yes, your Honor.

THE COURT: So, I -- I mean, if -- if your theory is that inducing the use of the product amounts to inducing infringement, you need to cite better case law. Do you have anything that says that that's sufficient?

MR. NEWELL: Everything that I would have would be already in our brief.

THE COURT: On contributory infringement, the complaints refer to modules in the accused software that had substantial noninfringing uses. So, what are those modules?

MR. NEWELL: Let's see. I know we specifically identify SiteWorks synthetic data generation modules and Parallel's virtual camera configuration. Beyond that, we don't have specifically in our --

THE COURT: Okay. And those are not -- well, and we had a question earlier. Those phrases, virtual camera configuration tool, is that a phraseology or a nomenclature used by Parallel to describe its own products or is that --

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Thursday, March 19, 2026